**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Our Sacred Sanctuary, Inc., an incorporated Florida non-profit religious corporation, et al.,<br><br>Plaintiffs,<br>v.<br><br>Todd Blanche, in his official capacity as Attorney General of the United States, et al.,<br><br>Defendants. | Case No. 6:26-cv-00278-GAP-NWH |

# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1. Pursuant to Federal Rule of Civil Procedure 65(b), Our Sacred Sanctuary, Inc., ("Church"), Norelle Adams, Rob Wilson, and Lora Wilson (collectively, "Plaintiffs") for the reasons set forth in the Memorandum of Law as supported by exhibits and declarations submitted therewith and incorporated herein, respectfully move this Court for a preliminary injunction enjoining Defendants from arresting, prosecuting, or threatening Plaintiffs with arrest, prosecution and/or imprisonment for manufacturing, distributing, possessing, and ingesting ayahuasca for the Church's religious purposes.

2. Plaintiffs are engaged in a sincere religious practice inspired by indigenous spiritual traditions in the Amazon, utilizing ayahuasca as a sacrament. On December 6, 2024, law enforcement agents including Drug Enforcement

Administration ("DEA") agents raided the sanctuary of Plaintiffs and seized numerous items including Plaintiffs' sacrament ayahuasca. Plaintiffs were detained and interrogated during the initial raid and the Church and its members were deprived of their sacrament and other property.

3. Based on the law and facts laid out herein, the Court should grant a preliminary injunction enjoining Defendants' violations of Plaintiffs' religious freedoms under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, et seq. ("RFRA"). Plaintiffs' unquestionable religious sincerity and their record of conducting religious ceremonies without *any* effect on public safety, paired with the statutory authorities described in the accompanying Memorandum of Law, demonstrate Plaintiffs will prevail in this matter. Plaintiffs have already been irreparably harmed. Because federal law criminalizes and prohibits Plaintiffs' spiritual practices, unless this Court grants an injunction, Defendants will continue to substantially burden Plaintiffs' religious practices and effectively destroy their religious practice.

WHEREFORE, for the foregoing reasons, and those set forth in Plaintiffs' supporting Memorandum of Law below, Plaintiffs respectfully request this Court enter a preliminary injunction and provide the other relief requested in the Memorandum of Law.

# MEMORANDUM OF LAW

## I. INTRODUCTION

1. Plaintiffs filed their Complaint in this case to vindicate their rights under the RFRA based on Defendants' seizure and destruction of their religious sacrament. Declaration of Norelle Adams ("Adams Decl.") p. 19 ¶47-48, p. 20 ¶49; Declaration of Rob Wilson, ("R. Wilson Decl.") p. 8; Declaration of Lora Wilson, ("L. Wilson Decl.") p. 5-6.

2. Plaintiffs' unquestionable religious sincerity and their record of conducting religious ceremonies without any effect on public safety, paired with the statutory authorities described below, demonstrate Plaintiffs will prevail in this matter. Because federal law criminalizes and prohibits Plaintiffs' spiritual practices, unless this Court grants an injunction, Defendants will continue to substantially burden and effectively destroy Plaintiffs' religious practice. L. Wilson Decl. 5-6; R. Wilson Decl. p. 9-10; Adams Decl. p.22 ¶52.

## II. STATEMENT OF FACTS

### A. Church Background and Government Raid

1. The Church is a Florida non-profit religious corporation. The Church has approximately 150 members. The sacramental practice of using ayahuasca dates back more than 2,000 years among indigenous people in the Amazon. The leaders of the Church, the named Plaintiffs, studied under various individuals connected to indigenous traditions, including members of the Yawanawa, Huni Kuin,

Shipibo, Kuntanawa tribes and other indigenous traditions. The leaders of the Church worked collectively for several years as part of another ayahuasca spiritual practice in Florida prior to founding the Church. The Church is a syncretic religious practice that incorporates the sacramental use of ayahuasca as an essential element of its spiritual beliefs which include (a) ayahuasca is a sacred being and provides direct communication with the Creator; (b) death is not the end of the living of the soul; (c) each person is a child of the Earth, each precious to the Creator, and as such they strive to be in one with nature and plants; (d) there is no hierarchy in this life, that the Creator has created all beings equally and perfectly; and (e) elements of other spiritual traditions, including Christianity. See, Declaration of J. Gordon Melton, Ph.D. ("Melton Decl.") ¶ 15 ; Adams Decl. p.8 ¶19.

2. The intent of Plaintiffs has always been to operate a religious organization in compliance with the RFRA. See R. Wilson Decl. p.8; N. Adams Decl. p 3. From April 2023 through August 2024, Plaintiffs conducted religious ceremonies under their tradition. Ceremonies are conducted following strict protocol to ensure proper participant screening and safety, and to prevent the diversion of ayahuasca for non-religious purposes. Adams Decl. p.14-15 ¶37.

3. On December 6, 2024, an undercover agent of the DEA entered the Church's property in Eustis, Florida under the pretense of attending a weekend religious ceremony. Immediately prior to their religious ceremony, Plaintiffs were detained, handcuffed, and left outside in the cold for over 6 hours. During this law

enforcement action, Defendants seized and confiscated all of the Church's sacrament which had been prepared by the Church for the sole intent of use during their religious ceremonies, as well as raw materials which included *Banisteriopsis caapi* and *Psychotria viridis*, both of which are legal to possess, and neither of which is listed under the Controlled Substances Act ("CSA"). Adams Decl., p.5 ¶10.

4. At the time of the DEA raid, all of Plaintiffs' sacrament was securely stored to prevent diversion. In addition to the sacrament itself, thousands of dollars' worth of raw materials, with even greater non-monetary spiritual value, were seized. Since the confiscation of the Church's sacrament, no criminal charges have been filed, but the threat of prosecution, raids, or seizure of sacrament remains real and imminent given Defendants' actions. Although the Church requested the return of its sacrament and sacred materials, the DEA informed Plaintiffs that those materials were destroyed. Adams Decl., p. 20-21 ¶49.

5. The Church and its members believe that each person has their own connection to God and that there are many truths leading to the same source. The Church believes everyone can come to their own conclusions one on one with the guidance of ayahuasca to have direct communication with the Creator. The Church teaches that the purpose of life is to enjoy it in all its variety and to experience it all. The Church believes that death is not the end; that this life is an experience the soul is having and will go on to another experience after this "life" is done. See, Adams Decl., p. 7 ¶16.

6. The Church doctrine explains that ayahuasca bestows upon humanity an extraordinary gift through her divine medicine. This gift allows for the collective evolution of human consciousness by offering direct experiences with the divine. The Church is nondenominational and honors everyone's divine consciousness and their connection to the Divine. The Church incorporates beliefs from many religions and diverse cultures around the world. Members of the Church utilize ayahuasca as the conduit to bridge each person's unique connections to God. Adams Decl., p.7 ¶16. Ayahuasca illuminates the spiritual truths taught by the Church and helps participants internalize moral, ethical, and spiritual truths.

7. The Church teaches that all people are children of the Earth, each precious to the Creator, and as such each participant strives to be one with nature and plants, receiving the gift of life with the symbiotic nature of breath. The Church teaches that the Creator has created all beings equally and perfectly from the ants to the birds, to people, and to the trees. Adams Decl., p.8 ¶19.

8. The Church teaches that the world in which we reside is metaphysical in nature; that this world is only partly what we can see and experience and much of the universe is beyond what we can tune into unless one imbibes the sacred ayahuasca during religious ceremonies. Adams Decl., p. 8 ¶20.

9. The Church has a code of ethics that is clear and succinct. It comes from experience with ayahuasca and direct communication with ayahuasca, the Divine Mother, on how she would like to be treated and utilized in and around the Church.

The three main points of the code of ethics are: (a) Integrity - maintaining clear and honest communication in all experiences; (b) Community - maintaining connection with community is essential for the Church and as such, clear confidentiality in one's experiences should always be honored whether in ceremony or in integration; and (c) Reverence - participants come to ayahuasca with clear respect and reverence for the sacred nature of the ceremony, the opportunity to commune with ayahuasca, and one's connection to Creator. Adams Decl., p. 9 ¶22.

10. The Church embraces the belief that each person is inherently whole and does not need to be "fixed." Life's challenges and obstacles may create an illusion of separation from wholeness, and ayahuasca helps illuminate this separation. The process of working with ayahuasca allows people to shed thoughts, beliefs, and behaviors that no longer serve them, revealing the perfect wholeness already present within. Adams Decl., p. 10 ¶24.

11. The Church's doctrine teaches that through ceremonial use of its sacrament, members commune with their ancestors, their higher selves, their guardian angels, guides, mentors, the Divine and the spirit of Mother Earth. Through this process, profound moral and ethical lessons are transmitted through which deep healing occurs, allowing Church members to process or release unresolved karma, complete broken promises, heal spiritual trauma, make a connection to the Divine

and come to an understanding of their individual purpose in life, the primary calling to fulfill their Divine mission. Adams Decl., p. 10 ¶25.

12. The Church's doctrine teaches that its sacramental ceremonies allow for a connection to the Divine, creating a profound transformation within its members, guiding them to a deeper sense of self-love and acceptance, which in turn leads to living fulfilled lives, becoming better parents, partners, friends, stewards of change, and healing for planet Earth. Adams Decl., p.7 ¶16.

13. The Church takes measures to maintain responsible control over its sacred medicine. The use of ayahuasca outside of a ceremonial setting is sacrilegious and offensive to the Church's values. The sacramental nature of ayahuasca requires utmost care. Much like the sacrament of Christian Holy Communion, the Church keeps its sacrament safe both from possible theft and from unharmonious energies. Handling of ayahuasca follows reverent ceremonial protocols. The Church's ayahuasca sacrament is brewed by Church leaders in a sacred manner. Obtaining the raw materials for preparing its sacrament is a crucial part of the Church's practice. See Adams Decl., p. 5-7.

14. At any given time, the Church possesses a quantity of raw materials and ayahuasca sufficient for its congregation, which is stored in a secure manner. The Church's raw materials and ayahuasca may only be handled by Church leadership. The Church engages in practices to track the quantity of raw materials used and ayahuasca consumed, ensuring no one has access to its raw materials or ayahuasca

outside of the ceremonial setting, and for the proper disposal of any unused or spoiled sacrament. Adams Decl., p. 18-19 ¶46.

15. The Church has protocols for both medical and psychological intakes for all members to ensure they do not experience any physical or mental harm from the use of the sacrament. These protocols include intensive screening, a review of medical history including any medication or supplements used, a review of psychological history to insure no psychological conditions might be triggered by partaking of the sacrament, extensive preparation prior to ceremony, strict supervision during ceremony and, post ceremony integration as well as maintaining contact with members between ceremonies in case any reassessment is required. See, Adams Decl., p. 14-18. The Church's protocols have been reviewed by Dr. Michael Mithoefer, a psychiatrist, who has determined that the Church's sacrament, ayahuasca, poses a very low risk of harm to the Church's members due to the protocols of the Church which include medical and psychological screening, low dosage especially for first time participants, integration and follow up. Declaration of Dr. Michael Mithoefer ("Mithoefer Decl.") ¶8.

16. As stated herein, the Church is a genuine religion. Its members have sincere beliefs based upon the Church's doctrine, and ayahuasca is an essential practice of the Church without which the Church cannot provide essential services, and its members cannot practice their religion. Melton Decl. ¶14; Adams Decl., p. 22 ¶52.

B. Legal Status of Ayahuasca

1. In 2006, the Supreme Court unanimously ruled that the religious organization O Centro Espirita Beneficente Uniao Do Vegetal ("UDV") had the right to use ayahuasca as a religious sacrament in the United States under the RFRA.[1] The UDV filed a declaratory and injunctive action, alleging, inter alia, that applying the CSA to its sacramental tea use violated the RFRA. The Court of Appeals for the Tenth Circuit affirmed the granting of relief based on the Government's failure to demonstrate a compelling interest justifying a complete ban on the importation and religious use of the ayahuasca tea used by the UDV.

2. Members of the UDV receive communion by drinking ayahuasca that contains a small amount of DMT which is regulated under Schedule I of the CSA, 21 U.S.C. § 812(c), Sched. I(c)). The Government conceded that the challenged application would substantially burden a sincere exercise of religion but argued that this burden did not violate the RFRA because applying the CSA was the least restrictive means of advancing three compelling governmental interests: protecting the church members' health and safety, preventing the diversion of ayahuasca for recreational use, and complying with the 1971 United Nations

[1] *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,* 282 F. Supp. 2d 1236 (D. N.M., 2002) (*O Centro I*); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170 (*O Centro II*); aff'd, *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006)("*O Centro III*") – collectively "*O Centro* cases." See also, *Church of the Holy Light of the Queen v. Mukasey*, 2008 U.S. Dist. LEXIS 102990 *; *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210; *Church of the Holy Light of the Queen v. Holder*, 443 Fed. Appx. 302 *; 2011 U.S. App. LEXIS 14710 *

Convention on Psychotropic Substances. The Supreme Court held that the UDV effectively demonstrated that its sincere exercise of religion was substantially burdened, but that the Government failed to demonstrate the application of the burden to the UDV would, more likely than not, be justified by the asserted compelling interests. Congress' placement of DMT under Schedule I simply did not relieve the Government of the obligation to shoulder its burden under the RFRA. As a result of the Court's ruling, the Government defendants abandoned their attempt to prevent the importation, distribution, and ingestion of ayahuasca by means of a settlement agreement. Thus, the Supreme Court has clearly recognized that the sincere religious use of ayahuasca such as the Church's practices herein are protected from the general applicability of the CSA and related laws interfering with the importation and use of ayahuasca.

3. Shortly after the Supreme Court ruled in favor of the UDV, a congregation of the Church of the Holy Light of the Queen ("Santo Daime"), after a full trial on the merits, obtained similar relief that the sincere religious use of ayahuasca is a protected practice under the RFRA. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210 (D. OR 2009). The Government did not challenge the district court's conclusion that an outright prohibition on the importation of ayahuasca by the Santo Daime violated the RFRA. Instead, the Government only challenged the scope of the district court's injunction, which in part enjoined the Government from enforcing certain regulations and corresponding statutory

provisions set forth in the CSA. The Ninth Circuit vacated the injunction and remanded the case back to the lower court. *Church of the Holy Light of the Queen v. Holder*, 443 Fed. Appx. 302. The remand resulted in a one-sentence order from the Oregon District Court, which reads, "Defendants [the government] are enjoined from prohibiting plaintiffs' importation, storage, distribution, and use of Daime [ayahuasca] tea for plaintiffs' religious ceremonies" *Church of the Holy Light of the Queen v. Holder*, Second Amended Judgment of Owen M. Panner, 1:08-cv-03095-PA (2012). The Government did not appeal this order, again acknowledging there is no basis in law to substantially burden the sincere religious use of ayahuasca.

4. Recently, three other religious organizations using ceremonial ayahuasca have been recognized by the federal government through settlement agreements. In 2024, the federal government agreed to a settlement with the Church of the Eagle and the Condor, granting that organization import and manufacturing permits to use ayahuasca in ceremonies. See, *The Church of the Eagle and the Condor et al. v. Garland et al.*, 22-cv-01004-SRB (D. Ariz.). In 2025 the federal government entered into a similar agreement, acknowledging there is no compelling governmental interest in prohibiting the religious use of ayahuasca. See, *The Church of the Celestial Heart, et al. v. Garland, et al.*, 23-cv-00545-SAB (E. Dist. of Calif). Similarly, in May 2025, the government granted a Schedule I permit to the Church of Gaia to import, possess, use and distribute ayahuasca. In

each of these cases, the government implicitly admitted that it has no compelling religious government interest to limit the religious use of ayahuasca.

5. Courts have determined that differences in theology are a tenuous basis for selectivity in governmental accommodations. Regarding the factual and legal issues in this case, the Church is similarly situated to the UDV, Santo Daime, the Church of the Eagle and the Condor, the Church of the Celestial Heart, and the Church of Gaia. In these cases, the courts held or the government conceded that the government does not have a compelling interest in preventing the importation, distribution, and ingestion of ayahuasca for religious purposes. In each of these cases, the government failed to establish that ayahuasca was dangerous to the health of the churches' members or to the public, or that it was likely the sacramental tea would be diverted for illicit consumption.

## III. LEGAL STANDARDS

1. The RFRA protects Plaintiffs' sincere religious beliefs from interference by the government. To establish a prima facie claim under the RFRA, a plaintiff must show that, "the activities the plaintiff claims are burdened by the government action must be 'an exercise of religion'" and "the government action must substantially burden' the plaintiff's exercise of religion." *Navajo Nation v. U.S. Forest Serv.*, 353 F.3d 1058, 1068 (9th Cir. 2008) (quoting 42 U.S.C. § 2000bb-1(a)). Where a plaintiff has established these elements, "the burden of persuasion shifts to the government to prove that the challenged government action is in

furtherance of a compelling governmental interest' and is implemented by the 'least restrictive means.'" *Navajo Nation* at 1068 (quoting 42 U.S.C. § 2000bb-1(b)). See also, *Oklevueha Native Am. Church of Haw., Inc. v. Lynch* ("*Oklevueha II*"), 828 F.3d 1012, 1015 (9th Cir. 2016), cert. denied, 2016 U.S. LEXIS 7200 (2016), quoting *Navajo Nation*, 535 F. 3d. at 1068.

2. The sincerity inquiry is important for eliminating free-exercise claims that solely attempt to circumvent laws, but "it must be handled with a light touch, or judicial shyness." *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012). So, "the inquiry into the sincerity of [the] plaintiff's religious beliefs is almost exclusively a credibility assessment." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) "[T]he timing of the adoption of a religious belief is "immaterial" to the determination of whether a person's religious exercise has been burdened." See, *Jones v. Slade*, 23 F.4th 1124, 1143 (9th Cir. 2022). See also, *Hobbie v. Unemployment Appeals Comm'n Fla.*, 480 U.S. 136, 144, 107 S. Ct. 1046, 94 L.Ed.2d 190 (1987) (refusing to "single out the religious convert for different, less favorable treatment than that given an individual whose adherence to his or her faith [is less recent]"); see also, *Callahan v. Woods*, 658 F.2d 679, 687 (9th Cir. 1981) ("So long as one's faith is religiously based at the time it is asserted, it should not matter ... whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible."). The Supreme Court has explained "it is not for the court to say that their religious

beliefs are mistaken or insubstantial. Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction." *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014). This shows that Courts are not meant to decide if a religious belief is mistaken or unreasonable. See, *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707 (1981). The Court's "narrow function . . . is to determine" whether the asserted religious belief reflects "an honest conviction." *Hobby Lobby*, supra. There is no basis to doubt as to Plaintiffs' religious beliefs in this case.

3. In order to be granted a preliminary injunction, Plaintiffs must demonstrate four elements: (1) a substantial likelihood that they will ultimately succeed on the merits of their lawsuit; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) if issued, the injunction will not adversely affect the public interest. See, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The moving party bears the burden of persuasion as to these four pre-requisites. See, *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); accord *Siegel*, 234 F.3d at 1176.

## IV. ARGUMENT

### A. Plaintiffs are Substantially Likely to Succeed on the Merits

1. The RFRA "provides very broad protection for religious liberty" given that religious exercise is an "unalienable" right. *Little Sisters of the Poor Saints Peter &*

*Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020). As such, the RFRA provides "greater protection for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). The Supreme Court has instructed that the RFRA be "construed in favor of broad protection of religious exercise, to the maximum extent permitted . . ." *Burwell*, 573 U.S. at 696, 714 (2014). Religious individuals and organizations that prevail under the RFRA are entitled to damages in addition to injunctive relief. *Tanzin v. Tanvir*, 592 U.S. 43, 50-52 (2020).

2. The Supreme Court has been clear that corporate entities, just like individuals, are entitled to protection under the RFRA. *Hobby Lobby*, supra. at 706-09. The Court made clear that regardless of whether the businesses were "closely held corporations," "nonprofit corporations," "for-profit corporations," some other corporations, or "natural persons," they would be within the RFRA's ambit. *Id.* at 708-09. The *Hobby Lobby* case explains that the "least-restrictive-means standard is exceptionally demanding." *Id.* at 708.

3. The Supreme Court has defined religion as any sincere and meaningful belief that occupies in the holder a place that is equivalent to the position that God has in traditional religions. *United States v. Seeger*, 380 US. 163, l76 (1965).

4. The government conceded in the UDV case, that banning ayahuasca works a substantial burden on the UDV. *O Centro III*, 546 US. at 426. See, *Callahan v. Woods*, 736 F.2d 1269, 1272-73 (9th Cir. 1984) ("Focusing on the degree of the

interference factor, it is clear that when the government totally precludes religious conduct by imposing criminal sanctions, the burden weighs at its heaviest.").

5. In *Grosz v. The City of Miami Beach*, 721 F.2d 729, 736 (11th Cir. 1983), the Court stated:

> "In cases where religious practices conflict with the public interest, to make accommodation between the religious action and exercise of state authority is a particularly delicate task [citations omitted] because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution. *Wisconsin v. Yoder*. . . . the government can as easily achieve its policy objective without burdening [the] religious conduct, [and thus] the burden on the government is [virtually] zero and the scale necessarily reads against upholding the government action."

6. There can be no question that Plaintiffs are exercising their sincere religious beliefs. See Melton Decl. ¶19. Plaintiffs pursued this spiritual path for several years prior to forming the Church. Melton Decl. ¶13. Plaintiffs formed the Church in 2022 and formally incorporated the practice in 2023, demonstrating their commitment to the spiritual values of the Church. Consistent with its stated beliefs, the Church (through its leadership) refrains from imposing all but the most broad and abstract beliefs upon its members, rather affirming the sacred nature of the

individual and his/her competence to encounter the Divine and construct their own vision of the Divine life easily meeting the definition of religious beliefs under law. See Melton Decl., ¶15.

7. Plaintiffs' robust ethical practices ensure there are no concerns about diversion or safety as part of this religious practice. As discussed herein, Plaintiffs do not allow sacrament to be provided outside the scope of a religious ceremony. Sacrament is tracked and kept in a secure place to prevent theft, and participants are put thorough a comprehensive assessment to ensure they do not have any significant contraindications that would put them at risk in a ceremony.

8. Because ingestion of the sacramental tea is at the center of the Church's religious practice, criminalizing the use of the tea has not only had a chilling effect on Plaintiffs' ability to practice their religion, but also a heightened effect of threatening this small Church's very existence in the United States. As discussed herein, Plaintiffs cannot practice their religion or hold ceremonies in the absence of their sacramental tea. A government law or regulation that causes a party to forgo a central religious practice imposes a substantial burden on religion. *Hobbie v. Unemployment Appeals Comm'n Fla.*, 480 U.S. 136, 140-141 (1987).

9. Once Plaintiffs establish their prima facie case - that the government is substantially burdening their exercise of religion - the burden then shifts to the government to demonstrate that application of the burden to the Plaintiffs is in furtherance of a compelling governmental interest; and is the least restrictive

means of furthering that compelling governmental interest. *Navajo Nation v. United States Forest Service*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc).

10. In the *O Centro* cases (fn. 1), the Government raised four compelling interests: 1) the uniform application of the CSA means there can be no exception to the DMT ban to accommodate religious use; 2) complying with the 1971 U.N. Convention; 3) protecting the UDV members' health and safety; and, 4) preventing the diversion of ayahuasca from the UDV to recreational users. *O Centro III*, 546 U.S. 418, 434-439.

11. The Supreme Court rejected the Government's arguments regarding the uniformity of the CSA and complying with the 1971 U.N. Convention, and accepted the findings of the District Court which concluded the Government had failed to demonstrate a compelling interest justifying the substantial burden on the UDV.

12. In the present case, the amounts of DMT and harmines present in the Church's sacrament, prepared solely from *Banisteriopsis caapi* and *Psychotria viridis*, (Adams Decl. p. 4) are consistent with reports in the literature for other religious organizations using ayahuasca including the UDV and Santo Daime. See Declaration of Nicholas V. Cozzi, Ph.D., ("Cozzi Decl.") ¶8. As such the levels of DMT and harmines in the Church's sacrament would not be damaging to cells or cause other harmful effects. Cozzi Decl. ¶9. Furthermore, the Church's sacrament poses a very low risk of harm to its members due to the protocols of the Church, as aforementioned, which include medical and psychological screening, low dosage

especially for first time participants, integration and follow up. Finally, the Church has very vigorous diversion protocols; it is the Church's policy that no one can participate in Church ceremonies for non-religious purposes. See, Adams Decl., p. 14-15 ¶37.

13. Even if Defendants could show a compelling governmental interest (which they have been unable to do in any of the prior ayahuasca church cases) they cannot show that the least restrictive means is the arrest of Plaintiffs, destruction of their sacrament and prohibition on Plaintiffs' use of their sacrament for religious purposes. *Church of the Holy Light of the Queen, et al., v. Mukasey*, et al., 615 F. Supp. 2d 1210, *1219 (D. OR. 2009). The least restrictive means would be the granting of a Schedule I permit as has been done in five other cases with churches using ayahuasca as a sacrament in their religious ceremonies.

B. <u>Irreparable Injury will Occur if an Injunction is not Granted</u>

1. The loss of religious freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). Plaintiffs have already suffered irreparable injury due to their detention by law enforcement, the stopping of their spiritual ceremonies by the government, and the seizure of and refusal by the DEA to return their sacrament.

2. The DEA has created a non-mandatory guidance process allowing groups to petition the agency for an exemption to use controlled substances in a religious

context. Context. See, Declaration of Jack Silver ("Silver Decl.") Exhibit A - DEA Guidance Document. However, even if Plaintiffs were to seek a permit from the DEA to lawfully use their sacrament through this non-mandatory process, the DEA Guidance Document requires a total cessation of the central practice of the Church, the consumption of its sacrament ayahuasca, while the petition is being considered. Silver Decl., Exhibit A, DEA Guidance Document, p. 2, ¶7. The DEA Guidance Document was first issued in 2009. Silver Decl. ¶4. Despite numerous applications, as of May 9, 2024, 15 years after promulgating the DEA Guidance Document, the DEA had not granted any exemptions. See, Silver Decl., Exhibit B, DOJ Response to Requests for Admission No. 5. As of today, the DEA has only approved 1 religious organization. Given the substantial burden on religious practices imposed by the DEA Guidance Document and the lack of any real attempt on the part of DEA to respond to petitions, there is no legal pathway other than this lawsuit to prevent a substantial burden on Plaintiffs' religious activities. Without an injunction, Plaintiffs remain subject to the enforcement of the CSA against them, including seizure and destruction of their sacrament. After the 2024 raid in this case, DOJ lawyers refused to enter into a voluntary process to grant Plaintiffs a DEA permit and allow them to continue practicing their religion. Silver Decl. ¶5. Therefore, there is no other path to federal recognition other than an injunction that would allow Plaintiffs to continue practicing their religion. Without an injunction, Plaintiffs will clearly suffer irreparable harm.

C. The Balancing of Harm Weighs in Plaintiffs' Favor

1. In balancing harms, a court looks at whether the moving party's threatened injury outweighs the injury the opposing party will suffer under the injunction. A court may consider only the potential harm to the non-movant that may be suffered while an injunction is in place, or which would be suffered permanently as a result of the injunction. In considering the potential harm to a non-movant, a court may discount potential harm that would arise due to the actions of the non-movant. *Telestrata, LLC v. NetTALK.com, Inc.*, 126 F. Supp. 3d 1344, 1355 (S.D. Fla. 2015).

2. No heavier burden on Plaintiffs' religion is possible. The only way the Church's members could deal with the persecution and harassment would be to remain underground, with the attendant fear of arrest, imprisonment, confiscation of their holy sacrament, loss of professional licenses, and loss of their homes if they conduct services at home. This is an intolerable burden on their religious freedom. The confiscation of Plaintiffs' sacramental tea and continuing threats of prosecution and seizure of their sacrament create a significant, ongoing fear in Plaintiffs that they will be arrested, prosecuted, and imprisoned if they continue their efforts to practice their religion. These threats have a severe "chilling effect" on Plaintiffs' rights to freely practice their religion.

3. Plaintiffs have been placed in extreme jeopardy since the seizure of their sacramental tea. Plaintiffs should not be forced to make a Hobbesian choice of

either abandoning their religion or risking arrest and prosecution. There is no conceivable potential harm to the government in maintaining the status quo given the fact the government has authorized five other ayahuasca religious practices to operate. The balance of equities leans heavily in favor of Plaintiffs.

D. Granting an Injunction will not Adversely Affect the Public Interest

1. It is always in the public interest to protect religious liberties. *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1111 (N.D. Fla. 2016). Granting the injunction requested by Plaintiffs herein will not adversely affect the public interest for several reasons. First, there is no recreational market for ayahuasca. Next, even if there were some illicit market for ayahuasca, as discussed herein Plaintiffs track their inventory and store it in secure location to avoid any diversion. More importantly, as discussed herein, the Church does not distribute its sacrament for non-religious purposes.

2. Through litigation and voluntary settlements, there are five other federally recognized ayahuasca churches in the United States. Adding another will not harm the public interest in any way. The Church's sacrament is not dangerous to human health. As validated by numerous studies and individual testing in this case, the consumption of the Church's sacrament does not lead to any significant or enduring health threats for participants. See, Mithoefer Decl. ¶¶4,5; Cozzi Decl. ¶9. Given the robust screening process undertaken by Plaintiffs as discussed herein, and the measures taken to ensure the presence of people at ceremonies who are

trained in basic life support, there is no significant chance that a participant will be harmed during a ceremony. In fact, to date, no participant has suffered a mental or physical health problem. See, Adams Decl., p. 18 ¶45.

## V. CONCLUSION

For the reasons and on the grounds stated herein, the Court should grant the following relief:

a. Grant Plaintiffs a preliminary injunction enjoining Defendants from arresting, prosecuting, or threatening Plaintiffs for manufacturing, distributing, possessing, and ingesting ayahuasca for religious purposes.

b. In the alternative, grant Plaintiffs an evidentiary hearing to present evidence supporting this Motion.

c. Following a hearing, granting a preliminary injunction, an Order that within thirty days the Parties shall present to this Court a plan to effectuate the permitting and licensing of the Church to manufacture, distribute, possess, and use its sacrament, ayahuasca, for religion purposes consistent with the rights of Plaintiffs under the RFRA.

DATED: April 16, 2026 Respectfully submitted,

LAW OFFICE OF JACK SILVER

By: */s/ Jack Silver*

Jack Silver Esq., *pro hac vice*
California SB#160575
708 Gravenstein Hwy North, #407
Sebastopol, CA 95472
jsilverenvironmental@gmail.com

Tel. (707) 528-8175

McALLISTER LAW OFFICE, P.C.

By: __*/s/ Sean T. McAllister*___
Sean T. McAllister, Esq., *pro hac vice*
Colorado SB # 310962
4035 E. 3rd Avenue
Denver, CO 80220
Sean@mcallisterlawoffice.com
Tel. (720) 448-6235

BARZEE FLORES ATTORNEYS AT LAW

By: __*/s/ William R. Barzee*___
William R. Barzee, Esq. SB #158720
BARZEE FLORES ATTORNEYS AT LAW
Courthouse Center 40 NW Third Street
Penthouse One
Miami, FL 33128-1838
Williambarzee@barzeeflores.com
Tel. (305) 374-3998

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I certify that on April 16, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel who have entered an appearance.

On April 1, 2026, U.S. Department of Justice attorney Jeremy Bloor informed Plaintiffs' counsel that he would be acting as attorney for all named Defendants in this action.

On April 16, 2026, a copy of this filing including all supporting Declarations was served on Mr. Bloor via email.

DATED: April 16, 2026

*s/ Jack Silver*
Jack Silver Esq., *pro hac vice*
California SB#160575
708 Gravenstein Hwy North, #407
Sebastopol, CA 95472
jsilverenvironmental@gmail.com
Tel. (707) 528-8175